*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0425p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BRIDGEPORT MUSIC, INC.; WESTBOUND RECORDS, INC.,

                    *Plaintiffs-Appellees,*

    *v.*

JUSTIN COMBS PUBLISHING and BAD BOY ENTERTAINMENT, individually and doing business as Bad Boy Records; UNIVERSAL RECORDS, a division of UMG Recordings, Inc.; UMG RECORDINGS, INC.; BAD BOY LLC,

                    *Defendants-Appellants.*

No. 06-6294

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00155—Todd J. Campbell, Chief District Judge.

Argued: July 19, 2007

Decided and Filed: October 17, 2007

Before: MARTIN and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jay S. Bowen, BOWEN RILEY WARNOCK & JACOBSON, Nashville, Tennessee, for Appellants. Richard S. Busch, KING & BALLOW, Nashville, Tennessee, for Appellees. **ON BRIEF:** Jay S. Bowen, Amy Jo Everhart, Timothy L. Warnock, BOWEN RILEY WARNOCK & JACOBSON, Nashville, Tennessee, Jonathan D. Davis, JONATHAN D. DAVIS, P.C., New York, New York, for Appellants. Richard S. Busch, KING & BALLOW, Nashville, Tennessee, for Appellees.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

ROGERS, Circuit Judge.  Plaintiffs, Bridgeport Music, Inc., and Westbound Records, Inc., owned the copyright to the Ohio Players' song, "Singing in the Morning."  Defendant music publishers[1] released the Notorious B.I.G. album *Ready to Die*, the title song of which contained an unlicensed sample of "Singing in the Morning."  After plaintiffs brought suit against defendants for copyright infringement, a jury found in favor of plaintiffs and awarded compensatory and punitive damages.  Bridgeport elected statutory damages under the federal Copyright Act, 17 U.S.C. § 101 et seq., and received the maximum award of $150,000.  Westbound received its one-half share of compensatory damages, $366,939, and punitive damages in the amount of $3.5 million.

Defendants make ten arguments on appeal:  (1) the jury verdict was the result of passion and prejudice; (2) the district court erroneously excluded evidence that defendants argue demonstrates that they did not infringe willfully; (3) the district court erroneously bifurcated the trial into liability and punitive damages phases after the trial had commenced; (4) UMG was released from liability; (5) the district court erred by failing to apportion compensatory damages between the infringing and non-infringing portions of the song and album; (6) the jury's award of compensatory damages improperly included compounded interest; (7) the jury's award of compensatory damages improperly included prejudgment interest; (8) the jury's selection of May 4, 1998, as the date from which prejudgment interest should be calculated was in conflict with state law; (9) the jury's $3.5 million punitive damage award was unconstitutionally excessive; and (10) the district court erred by entering an injunction and impoundment order.

Defendants are correct only with respect to issues six, seven, eight, and nine.  The jury's compensatory damage award appears to have been the result of a mistake, which resulted in the award's including compounded, prejudgment interest.  The date that the jury selected for the time from which prejudgment interest should be awarded was the beginning of the statute of limitations period, and thus conflicts with New York law (which governed Westbound's claims).  The punitive damages award violates due process when measured against defendants' conduct, the harm that plaintiffs suffered, and the statutory damages that federal law permits.  The other issues raised by defendants are without merit.  We remand with instructions for the district court to offer plaintiffs a remittitur with respect to the compensatory and punitive damages award and to select a reasonable date from which to calculate prejudgment interest.

**I.**

Christopher Wallace a/k/a Notorious B.I.G. was one of the rap world's biggest stars in the mid-1990s.  In 1994, Bad Boy Entertainment, Inc., d/b/a Bad Boy Records ("BBE"), as a joint-venturer with Arista Records, Inc., released Notorious B.I.G.'s first album, *Ready to Die*.  The album was a tremendous success, selling millions of copies and attaining multi-platinum status.  A version of the album with additional content was later re-released in 2004.

The title song of the album, "Ready to Die,"[2] was produced by Osten Harvey, Jr.  Sean "Diddy" Combs, BBE's principal, objected to the use of Jimi Hendrix's "Power of Love" as a

---

[1] Janice Combs Publishing, Inc. d/b/a Justin Combs Publishing ("JCP"), Bad Boy Entertainment, Inc. d/b/a Bad Boy Records ("BBE"), Bad Boy Records LLC ("BBLLC"), and Universal Records/UMG Recordings ("UMG").

[2] Throughout this opinion, I follow the convention of placing the album name in italics and the song name in quotation marks.

sample in "Ready to Die" because the Hendrix song was denied clearance. Harvey then substituted a portion of the Ohio Players' song "Singing in the Morning." BBE did not obtain a license to "Singing in the Morning" and authorized the release of *Ready to Die* with the understanding that not all samples on the album had been cleared.

A funk group, the Ohio Players, had released "Singing in the Morning" in 1972. Bridgeport Music, Inc. owned the copyright to the musical composition "Singing in the Morning," and Westbound Records, Inc. owned the common-law copyright to the sound recording embodying the musical composition of "Singing in the Morning."

Between April 16, 1998, and September 30, 1999, Jane Peterer, Administrator at Bridgeport, wrote letters (hereinafter referred to as "the Peterer letters") to BMG Records (which is a part of Arista Records), EMI Music Publishing (which, according to plaintiffs, administers JCP), and Big Poppa Music. In the letters, Peterer claimed that "Ready to Die" infringed on Bridgeport's copyright to "Singing in the Morning" and requested "a share of 25% of the new copyright 'Ready to Die'" to be made retroactive.

Plaintiffs did not receive a favorable response to the Peterer letters. On February 25, 2005, plaintiffs filed a complaint against defendants in the United States District Court for the Middle District of Tennessee.[3] This action was related to an earlier lawsuit filed May 4, 2001, and the parties stipulated that the action would be deemed to have been filed on that date for statute of limitations purposes. Although both Bridgeport and Westbound initially sued under the federal Copyright Act, an amended complaint pleaded alternative claims of common law copyright infringement, unfair competition, and misappropriation. The district court dismissed Westbound's claims under the federal Copyright Act because the sound recording, to which Westbound owned the rights, was not fixed in a tangible medium on or after February 15, 1972, *see* 17 U.S.C. § 301(c), but held that New York law governed Westbound's common law claims. Thus, at trial, Bridgeport was seeking relief under the federal Copyright Act and Westbound was seeking relief under New York common law. Both plaintiffs also sought punitive damages.

A nine-day trial ensued. Although neither party asked for, nor was in favor of, bifurcation, the district court decided, *sua sponte*, during the defendants' case-in-chief, to bifurcate the trial into liability and punitive damages phases. During closing arguments, plaintiffs' counsel asked the jury to award damages in the amount of $733,878 each to both Bridgeport and Westbound, and stated that although plaintiffs could not "collect double," the district court would "make sure that there is no double recovery."

On March 20, 2006, a jury found each of the defendants liable to Bridgeport for copyright infringement under the federal Copyright Act. The jury awarded Bridgeport actual damages and profits of $733,878, and, in the alternative, statutory damages of $150,000.

The jury also found each defendant, other than JCP, liable to Westbound under New York common law for copyright infringement and unfair competition. The jury awarded Westbound damages of $733,878. The jury chose May 4, 1998, as the date from which prejudgment interest would be awarded to Westbound. The jury also decided that Westbound was entitled to punitive damages against each defendant. After the punitive damages portion of the trial, the jury awarded Westbound punitive damages of $1.5 million from Bad Boy Entertainment, $1 million from Bad Boy, LLC, and $1 million from Universal Records/UMG Recordings, Inc.

---

[3]The Estate of Christopher Wallace a/k/a Notorious B.I.G. on behalf of Big Poppa Music was initially a defendant in this action, but was dismissed by order of the court after a compromise and settlement was reached with plaintiffs.

After the jury verdict, on April 28, 2006, defendants filed a "Motion for Mistrial or Modification of Verdict." Among other things, defendants argued that plaintiffs were entitled to receive one compensatory judgment award of $733,878, and that Bridgeport and Westbound were not both entitled to separate awards of $733,878 each. The district court noted that plaintiffs' counsel argued during closing remarks that the district court would prevent double recovery, and did just that by ruling that the compensatory damages would be split equally between Bridgeport and Westbound. Because Bridgeport elected statutory damages, *see* 17 U.S.C. § 504(c)(1), the district court ruled that Bridgeport would receive $150,000 in statutory damages under the federal Copyright Act, whereas Westbound would receive its share of the compensatory damages award, $366,939. In addition, the district court awarded Westbound $276,763.93 in prejudgment simple interest from May 4, 1998. The district court, however, ruled against defendants with respect to their arguments about the exclusion of post-litigation settlement offers, bifurcation, apportionment of damages, punitive damages, and the date from which prejudgment interest should have been awarded.

## II.

Defendants raise three issues on appeal that, if we were to agree had merit, would require a new trial. These issues, however, do not have merit and therefore we affirm the district court's judgment entered on the verdict with respect to these issues.

### A.      *Passion & Prejudice (Issue 1)*

The district court did not abuse its discretion by denying defendants' post-verdict motion for a mistrial based on defendants' arguments that the verdict was the result of the "passion and prejudice" of the jury. We reach this conclusion because the purportedly improper comments made by plaintiffs' counsel were not sufficiently prejudicial. If statements made during the course of closing arguments are improper, then this court may only set aside the verdict if "there is a reasonable probability that the verdict" was influenced by those arguments. *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998) (quotation omitted). Defendants did not object to the purportedly improper statements made by plaintiffs' counsel during closing argument and instead raised this issue for the first time in a post-trial brief that they filed on May 31, 2006. Because defendants failed to object during closing arguments, we require a heightened degree of prejudice in order to grant a new trial. *Id.*; *see also Portis v. Grand Trunk W. R.R. Co.*, No. 93-1721, 1994 U.S. App. LEXIS 17399, at *10-12 (6th Cir. July 12, 1994) (reviewing for "gross injustice" where party failed to object).

In the context of the entire closing argument and trial, the comments of plaintiffs' counsel were not sufficiently prejudicial to warrant a new trial. Defendants refer to a number of statements that plaintiffs' counsel made during closing arguments, but do not explain why each statement was improper. From the context of defendants' argument, it appears that they are arguing that some of these statements constituted improper appeals to local bias and that other statements improperly referred to defendants as large corporations. For example, plaintiffs' counsel argued to the jury, "This is a joke. They think they can come down here to Nashville, Tennessee, and pull a fast one on the six of you." Plaintiffs' counsel also argued,

> If it is okay to be looked down on and if it is okay to do what the defendants did, then I guess you have to tell them that. But if it is not okay, if in Nashville, Tennessee, we're not going to put up with that, then it is up to you. You six people today stand for the community that we live in.

With respect to punitive damages, plaintiffs' counsel repeatedly asked the jury to "tell the world that [what defendants did] is not going to happen in Nashville, Tennessee." Plaintiffs' counsel also, one

time, referred to one of the defendants as a "multi-million dollar company," and implied that defendants' expert was "a fancy guy from New York."

Cases relied on by plaintiffs are distinguishable. In *Whitehead v. Food Max*, 163 F.3d 265, 275-78 (5th Cir. 1998), the Fifth Circuit held that counsel's comments that appealed to local bias were prejudicial where counsel also ignored the district court's rulings on objections made by the other party and when considered with other prejudicial comments, including counsel's "improper 'Golden Rule' argument," and the size of the jury's verdict. In *Pingatore v. Montgomery Ward & Co.*, 419 F.2d 1138, 1142-44 (6th Cir. 1969), this court held that a new trial on damages was required when, during closing arguments, plaintiffs' counsel cursed, shouted, tore papers used by opposing counsel, and placed an empty chair before the jury and asked where the defendant corporation was. Here, there is no similar outrageous conduct by plaintiffs' counsel other than the improper references to Nashville and New York. Defendants only point to the fact that the jury deliberated for less than three-and-one-half hours and awarded plaintiffs the same amount of damages that plaintiffs demanded. Together, these considerations do not rise to the level of prejudice that would require a new trial.

The district court also did not abuse its discretion by rejecting defendants' argument that the amount of compensatory damages that the jury awarded was not supported by proof, and thus could only have been the product of prejudice, because the jury awarded the same amount of damages that plaintiffs demanded. Plaintiffs asked for $733,878 in damages each for Bridgeport and Westbound, and the jury complied. In a post-trial brief in response to the district court's order requesting briefing on remaining issues of law, plaintiffs stated that Westbound was only entitled to $706,888 because the amount that they asked for and were given by the jury included $28,140 in profits for JCP, to which plaintiffs conceded they were not entitled.[4] But defendants point out that if one were to add the $28,140 that Westbound excluded to the $706,688 that plaintiffs stated in their post-trial brief that Westbound was entitled to, the resulting amount is $734,828, not the $733,878 that plaintiffs requested from the jury. Defendants also argue that the damages award cannot be supported by the testimony of plaintiffs' expert on damages, Dr. Michael Einhorn, who testified at length about defendants' profits and plaintiffs' damages. Dr. Einhorn showed the jury slides that summarized his testimony and prepared an expert report in which he calculated defendants' profits and plaintiffs' damages. According to Dr. Einhorn's testimony, Bridgeport's total damages award should have been $842,688, with interest, and $768,232, without interest, and Westbound's total damages award should have been $758,634, with interest, and $688,523, without interest.

To the extent that the jury included compounded, prejudgment interest in the damages award, the award was supported by the evidence, as the award was—without the interest—less than Dr. Einhorn's estimates for both plaintiffs. It strongly appears that the jury did include compounded, prejudgment interest, as discussed separately in Part III.B., *infra*. Even if the jury did not consider compounded, prejudgment interest in calculating the damages award, the district court did not abuse its discretion. The jury was within a range supported by Dr. Einhorn's testimony, and even defendants' counsel during closing argument stated that Dr. Einhorn's testimony supported a damages award of "$800,000." Perhaps the jury was sloppy in calculating a damages award, and perhaps the jury thought that the number plaintiffs argued was the correct amount supported by the evidence, but given that the jury awarded an amount in a range that the evidence supported, and lower than the amount that defendants argued that plaintiffs' evidence supported, no gross injustice occurred.

---

[4]The district court did not make such an adjustment, and awarded Westbound instead its 50% share of the $733,878 jury verdict. Defendants do not challenge that decision in this appeal.

### B.          *Exclusion of Willfulness Evidence (Issue 2)*

The district court properly precluded defendants from offering as evidence, during the liability phase of the trial, defendants' post-litigation settlement offers, which defendants argue constitute evidence that they did not infringe willfully. Under the federal Copyright Act, a plaintiff may receive up to $150,000 in statutory damages if "the infringement was committed willfully." 17 U.S.C. § 504(c)(2).[5] Under New York law, punitive damages for common law copyright infringement and unfair competition are available "where a wrong is aggravated by recklessness or willfulness." *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1106 (2d Cir. 1982). The jury ultimately found that defendants' infringement was willful.

Defendants' evidence of post-litigation settlement attempts was inadmissible under Federal Rule of Evidence 408. Rule 408 provides that settlement offers are "not admissible to prove liability for or invalidity of the claim or its amount" but "does not require exclusion when the evidence is offered for another purpose." Fed. R. Evid. 408 (2005). The district court held that defendants' evidence fell within the exclusion clause of Rule 408 and that the "another purpose" clause did not apply because "the other purpose for which [the evidence] is offered is not appropriate." Further, in a post-trial order denying defendants' Motion for Mistrial or Modification of Verdict with respect to the admissibility of settlement evidence, the district court noted, "Defendants were permitted to introduce such evidence during the punitive damages phase of the trial, and the jury nevertheless awarded punitive damages. Defendants were also permitted to introduce evidence regarding the Peterer pre-litigation letters at the liability phase of the trial."

The district court's exclusion of defendants' evidence under Rule 408 was not an abuse of discretion, *United States v. Perry*, 438 F.3d 642, 647 (6th Cir. 2006), because the evidence was not relevant to the issue of liability.[6] One of the principal justifications for Rule 408 is that evidence of settlement offers is irrelevant. *See* Fed. R. Evid. 408 (Advisory Committee Notes); *Urseth v. City of Dayton*, 680 F. Supp. 1084, 1098 (S.D. Ohio 1987) ("[A] settlement offer or the fact of settlement negotiations is not direct evidence regarding the factual issues in a case."). Here, the only issue to which the evidence of settlement offers might have been relevant was to show that defendants did not act reprehensibly, and that plaintiffs were thus not entitled to a large punitive damages award. However, the fact that defendants offered to settle a lawsuit already brought by plaintiffs for past acts of infringement is not at all probative of whether defendants infringed willfully, and such a fact, therefore, was not relevant.

Defendants' arguments for why the district court erred are unpersuasive. First, defendants argue that evidence of settlement offers does not in this case "contravene Rule 408 or its spirit" because the goal of Rule 408 is to encourage settlement offers (and here, the offerors were the parties seeking to admit the offers). However, there is an alternative goal of Rule 408, discussed above, which is to exclude evidence that is frequently irrelevant. Second, Defendants argue that the evidence of settlement offers was offered for "another purpose," namely, to rebut plaintiffs' evidence of willfulness. Although rebutting evidence that another party introduces may be an acceptable other "purpose" under Rule 408, defendants' evidence here did nothing to rebut plaintiffs' evidence. Whereas plaintiffs' evidence of its pre-litigation settlement offers was probative of the fact that defendants had knowledge of, but disregarded, the infringement,

---

[5] If the infringement was not willful, then a plaintiff may receive statutory damages of between $750 and $30,000. 17 U.S.C. § 504(c)(1).

[6] Defendants also argue that the evidence was admissible under New York law. That argument is without merit because federal procedural law, which includes federal rules of evidence governing the admissibility of evidence, not state law, applies to cases in federal courts. *See, e.g.*, *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 n.1 (6th Cir. 2007).

defendants' evidence was not relevant to knowledge of the infringement. Instead, defendants' evidence purported to demonstrate that defendants did not have a "malicious" state of mind. This was not relevant to the issue of whether defendants infringed willfully. In addition, the district court did not prohibit defendants from rebutting plaintiffs' willfulness allegations with relevant evidence, such as evidence of how defendants responded to the Peterer letters. *See* J.A. 114. Furthermore, the district court permitted defendants to offer their evidence of settlement offers during the punitive phase of the trial, where that evidence actually might have been relevant.

Because the evidence that defendants sought to have admitted was not relevant to any issue that the jury needed to decide, the district court's alternative holding that the evidence "would confuse the jury," and thus was inadmissible under Federal Rule of Evidence 403, was also not an abuse of discretion. The evidence might, as the district court concluded, have improperly confused the jury, as it pertained to collateral and irrelevant events. Also, given the evidence's lack of probative value, the risk of unfair prejudice "substantially outweighed" the evidence's probative value.

Finally, even if the district court erred by excluding defendants' evidence, such error would have been harmless. During the punitive damages phase of the trial, defendants introduced the evidence that was excluded from the liability phase, yet the jury still awarded Westbound $3.5 million in punitive damages. If the excluded evidence would have made a difference with respect to the jury's determination that defendants acted willfully, surely the jury would not have awarded such a large amount of punitive damages (so large, in fact, that defendants argue it violated due process) after hearing the evidence.

### C.     Bifurcation (Issue 3)

The district court did not abuse its discretion by bifurcating the trial into liability and punitive damages phases. "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim . . . or of any separate issue . . . ." Fed. R. Civ. P. 42(b). A district court's decision to bifurcate a trial is reviewed for an abuse of discretion. *Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007). Here, defendants argue that the district court abused its discretion by bifurcating the trial during defendants' case-in-chief, and thus prejudiced defendants by admitting only plaintiffs' evidence relevant to the issue of punitive damages during the liability phase. Although "[s]ound judicial practice requires that, so far as practicable, the trial court's decision to bifurcate proceedings occur prior to trial," *Helminski v. Ayerst Labs.*, 766 F.2d 208, 213 n.3 (6th Cir. 1985), "[t]he late bifurcation of a trial does not constitute reversible error in the absence of a showing of prejudice," *id.* at 212.

Defendants were not, however, prejudiced by the district court's decision. Defendants sought to admit evidence of their settlement offers that they argue would have rebutted plaintiffs' evidence of plaintiffs' settlement offers. The district court, upon learning that defendants were going to present this evidence, decided to bifurcate the trial. *See* J.A. 2912-13 ("As a result of the position of the defendant, I am going to bifurcate this hearing . . . . I want to make it clear as a result of your request I am now going to bifurcate the punitive damage issue because I think that's more appropriate given the testimony you seek to offer, so we're going to bifurcate the punitive damage issue. We're not going to have any settlement evidence before this jury on the liability question.").[7] But as discussed above in Part II.B., defendants' evidence of settlement offers was not relevant to the issue of liability, whereas plaintiffs' evidence of settlement offers showed that defendants' had notice of the infringement, and thus was relevant.

---

[7]The district court later denied defendants' motion for a mistrial on these grounds.

Defendants argue that they were prejudiced by the bifurcation because plaintiffs were able to introduce all of their evidence with respect to punitive damages during the liability phase. It is true that plaintiffs stated to the district court, "I think that the proof that we have put on, quite frankly, is sufficient to the extent that Your Honor is going to allow settlement, any type of settlement discussions to be admitted." But plaintiffs specifically limited this statement to "settlement" evidence, and in fact plaintiffs did present evidence at the punitive damages phase of the trial. In any event, the evidence that defendants sought to admit during the liability phase did not concern the issue of whether defendants acted willfully, while plaintiffs' evidence was relevant to the issue of willfulness (as discussed in Part II.B., *supra*), and the fact that plaintiffs' evidence was also relevant with respect to the amount of punitive damages did not place a legal impediment to the district court's bifurcating the trial.[8] Furthermore, when defendants did introduce their evidence during the punitive damages phase of the trial, the jury nonetheless awarded a very large amount of punitive damages, which indicates that any error by the district court in bifurcating the trial was harmless.

## III.

With respect to the issues that defendants raise regarding the amount of damages that the jury awarded, the district court did not err by entering judgment on a verdict where, according to defendants, the amount of damages failed to allocate profits to account for the fact that the damage award included profits from non-infringing material. However, the verdict was improper to the extent that it included prejudgment and compound interest, included a calculation of interest from an incorrect date, and included unconstitutionally excessive punitive damages.

### A.        *Failure to Allocate Profits (Issue 5)*[9]

The $733,878 in compensatory damages that the jury awarded did not, as defendants argue, impermissibly include profits not attributable to the infringement. A victim of copyright infringement may recover "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b); *see also Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (interpreting an earlier version of this statute). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b); *see also Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998) (applying burden-shifting approach of statute); *Sheldon*, 309 U.S. at 406 ("Where there is a commingling of gains, [the infringer] must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.").

Here, plaintiffs met their initial burden of presenting proof of defendants' gross revenue. Plaintiffs presented evidence of defendants' profits from the album *Ready to Die*. Plaintiffs then estimated a fair allocation of profits to the song "Ready to Die" by dividing the album profits by the number of tracks on the album. (Plaintiffs used the same methodology for the original album, which

---

[8]Defendants also argue that plaintiffs introduced "evidence as to issues solely appropriate for the second component of the trial." Defendants list as this evidence their gross revenue and profits for 2003-2005, assets of Bad Boy entities, and gross sales of the album *Ready to Die*, including sales before the relevant statute of limitations period. However, defendants refer this court to pages 2997-3009 of the joint appendix, which is the transcript of plaintiff's cross-examination of a defense witness who testified during defendants' case-in-chief *after* the district court bifurcated the trial. At that point, defendants could have objected to the evidence for relevancy, and the district court did not plainly err by not excluding the evidence *sua sponte*.

[9]Issue 4, relating only to one defendant (UMG), is dealt with separately *infra*.

contained seventeen tracks, and the re-release version of the album, which contained nineteen tracks.)  The jury's verdict reflected this allocation.

The jury acted within its province when it rejected defendants' argument that plaintiffs' allocation included profits attributable to non-infringing elements of the song "Ready to Die." Defendants point to the testimony of their expert musicologist, Dr. Lawrence Ferrara, who evaluated the length of the infringing material in "Ready to Die" relative to the overall song, the licensing fee that an owner licensing the infringing material could have received, and the overall importance of the infringing material to the song, and concluded that the relative value of the infringing material was approximately 20.5%.  Defendants also argue that the jury failed to consider that the song was memorable (and successful) because of certain lyrics relating to Notorious B.I.G.'s life and death.[10] But, as the Eighth Circuit said in *Andreas v. Volkswagen of America, Inc.*, "[t]he question of allocating an infringer's profits between the infringement and other factors, for which the defendant infringer carries the burden, is 'highly fact-specific' . . . and should [be] left to the jury."  336 F.3d 789, 797-98 (8th Cir. 2003) (citation omitted).  Because the jury simply returned a numerical amount for damages, and did not specify how it calculated damages, there is no way of knowing the jury's reasons for rejecting defendants' arguments.  The jury could have agreed with Dr. Alexander Stewart, an expert witness for plaintiffs, who testified that defendants' expert, Dr. Ferrara, improperly employed a "strictly mathematical approach" in calculating the value of the infringing material to the song and that this failed to "tak[e] into account the significance of the passage to" the song.  Or the jury could have simply not believed the testimony of defendants' expert witnesses in light of the jurors' having heard the song and concluded that the infringing material was a much more valuable component of the song.  In any event, permitting the jury to determine that defendants failed to meet their burden of proving profits attributable to factors other than the infringing material was not reversible error.

The jury also acted within its province when it rejected defendants' argument that plaintiffs' allocation failed to consider that the song "Ready to Die" contributed little to the success of, and therefore the profits from, the album *Ready to Die*.  The jury could have agreed with plaintiffs' expert, Dr. Einhorn, who testified that over "the course of time, . . . all songs do tend to contribute equally" to the profits of an album and that although factors such as radio play, promotion, and music videos for particular songs might initially drive album sales, "it is not clear to [him] how to determine what song had any more or less salability ten years down the road."  The jury also could have agreed with Dr. Einhorn that, with respect to the re-release of the album, which contained new material, "[i]t is very difficult to determine without any kind of objective evidence, any kind of survey how much in that constellation of different new products was attributable to the new songs that were added" at the time of the re-release.  Or the jury could have found simply that defendants' subjective evidence on the value of the song to the album as a whole was insufficiently persuasive to meet defendants' burden.

> B.          *Inclusion of Compound and Prejudgment Interest in Damages (Issues 6 & 7)*

The amount of compensatory damages that the jury awarded, however, mistakenly included compounded, prejudgment interest.[11]  "This Circuit has determined a jury verdict should not be remitted by a court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'"  *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000) (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994)).  An award must

---

[10]Defendants also argue that plaintiffs' own analysts concluded that the infringing sample's value to the song "Ready to Die" was 25%.  The "25%" figure was one that plaintiffs calculated for settlement purposes, and the jury could have reasonably determined that the actual profits that corresponded to the infringing material were much higher.

[11]Plaintiffs do not argue that it was proper for the jury to have included interest as part of its verdict.

fall if, for example, it is "beyond the range supportable by proof" or is "the result of a mistake." *Id.* Here, it is evident that the jury award was the result of a mistake. Plaintiffs acknowledged in a post-trial brief that the amount that they requested from the jury included compounded prejudgment interest. *See* J.A. 1592. The jury awarded the same exact amount that plaintiffs requested, which Dr. Einhorn's testimony about the proper amount of damages excluding interest does not support. (Dr. Einhorn's testimony supported a total award to Westbound without interest of $688,523.) The district court noted that the jury was not required to accept the testimony of Dr. Einhorn and instead was permitted to exercise its own judgment, but this ignores the fact that the jury must rest its decision on the evidence, and if Dr. Einhorn's testimony about damages was the only evidence upon which the jury could rely, then the jury could not properly have awarded damages in a higher amount. Because plaintiffs mistakenly asked for a damages award that included compounded prejudgment interest, and the jury mistakenly awarded plaintiffs just that, we reverse this portion of the district court's order and remand so that the district court may offer Westbound a remittitur in the amount of damages excluding compounded prejudgment interest.

### C.       *Date of Interest (Issue 8)*

We also reverse that part of the district court's order denying defendants' post-trial motion with respect to the issue of the date from which prejudgment interest should be assessed. Defendants argued in a post-trial motion to the district court that the jury did not choose a "single reasonable intermediate date" from which to award interest, as it was required to do under New York law. The district court denied the motion "because this issue was properly considered and resolved by the jury in accordance with the jury charge which accurately stated the law," and "[t]he jury reasonably selected May 4, 1998 as the date from which prejudgment interest may be awarded." Defendants argue that May 4, 1998, is not a "single reasonable intermediate date" because, even though defendants began exploiting plaintiffs' copyright earlier, that date represents the earliest date of the statute of limitations period.

New York law provides that,

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b) (McKinney 2007). The "single reasonable intermediate date" must be a date after "the earliest ascertainable date the cause of action existed." The obvious intent of this provision is to estimate prejudgment interest on damages that plaintiffs receive. Reading the statute to mean that the "date the cause of action existed" can be a date earlier than the limitations period and that "a single reasonable intermediate date" can be the beginning of the limitations period necessarily awards prejudgment interest for damages incurred prior to the beginning of the limitations period. Because plaintiffs could not recover damages for infringement that occurred outside of the limitations period, they likewise could not receive prejudgment interest on damages incurred outside of the limitations period. Therefore, May 4, 1998, was not a "reasonable intermediate date."

New York law suggests that a remand for the district court to determine an appropriate date is appropriate. Defendants ask this court to select an intermediate date of April 1, 2002, the approximate midpoint between the date the limitations period began and the date the verdict was rendered. The district court, however, is in a better position, having heard the testimony in this case, to decide a reasonable intermediate date from which to assess interest. The statute provides that the date from which prejudgment interest should be calculated "shall be specified in the verdict," but

that "[i]f a jury is discharged without specifying the date, the court upon motion shall fix the date." *Id.* § 5001(c). Although the statute does not speak to the situation where a jury returns a date inconsistent with the statute, this situation is analogous to one in which the jury returns no date at all. Therefore, the district court should fix the date for prejudgment interest.

###### D.        *Unconstitutionally Excessive Punitive Damages (Issue 9)*

Westbound's $3.5 million punitive damages award is unconstitutionally excessive and violates due process. After conducting a de novo review, *see Bach v. First Union Nat'l Bank*, 486 F.3d 150, 153 (6th Cir. 2007), we conclude that this award was excessive in light of the Supreme Court's three "guideposts" for evaluating the constitutionality of a punitive damages award—the reprehensibility of defendants' conduct, the disparity between plaintiffs' harm and the award, and a comparison of the award and civil penalties in comparable cases. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).[12]

###### 1.        *Reprehensibility*

Defendants' conduct was not so reprehensible as to justify a $3.5 million punitive damage award. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. The Supreme Court has

> instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

Only one of these factors is present in this case—the harm was the result of intentional malice or deceit. The jury concluded that defendants acted "willfully" in light of evidence that defendants ignored pre-litigation letters and re-released the album knowing that it contained an unauthorized sample. Defendants continue to argue that the use of the sample was due to a rogue producer (Harvey), that they did not receive the pre-litigation letters, and that they re-released the album under the impression that the present lawsuit would be settled. The jury, however, rejected these arguments and found that defendants acted willfully. Although not a strong showing of intentional malice or deceit, defendants' conduct was still somewhat reprehensible.

None of the other reprehensibility factors are present. First, the harm in this case (copyright infringement) was purely economic and did not threaten the health or safety of others (and Westbound does not argue otherwise).

Second, Westbound is not a financially vulnerable victim. Westbound argues that it is financially vulnerable because it is a small company that depends almost entirely on income from

---

[12]Defendants could also have claimed that the district court abused its discretion by entering judgment on an excessive punitive damages award. *See Nardelli v. Stamberg*, 377 N.E.2d 975, 977 (N.Y. 1978). Instead, defendants chose to rely solely on the constitutional claim, and we accordingly address that issue only.

sampling, because defendants infringed "Singing in the Morning" instead of Jimi Hendrix's "Power of Love," and because defendants had "financial clout" and "strength in the music industry worldwide." Despite Westbound's size, Westbound has been a plaintiff in numerous similar lawsuits, and thus has been able to protect its rights in the courts. The fact that Westbound depends on income from sampling suggests that Westbound is not financially vulnerable, as its business model requires it vigilantly to sue on its copyrights. Defendants' refusal to use the Jimi Hendrix sample cuts both ways—it could mean that defendants actually tried to avoid copyright infringement, or it could mean, as Westbound argues, that defendants only avoided infringing copyrights owned by the powerful—but Westbound offers no evidence that the copyright owner of "Power of Love" was in a stronger financial situation than Westbound, a company that has proven its ability to protect its rights. Finally, defendants' wealth "cannot justify an otherwise unconstitutional punitive damages award," *State Farm*, 538 U.S. at 427, and thus should not be given great weight, *Clark v. Chrysler Corp.*, 436 F.3d 594, 604 (6th Cir. 2006).

Finally, there is no evidence that defendants' infringement was one of a repeated number of actions. The repeated conduct factor "'require[s] that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff.'" *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 1000 (6th Cir. 2007) (quoting *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 356 (6th Cir. 2005)). Here, Westbound argues that defendants' infringement involved repeated actions because defendants authorized the release of the *Ready to Die* album without confirming that all samples were legal and sampled "Singing in the Morning" on another track on the album. Westbound's first argument does not refer to other unlawful infringements, only the possibility that there were such acts (and defendants' indifference to that possibility). The second argument refers to the same transaction against the same plaintiff—the use of samples of "Singing in the Morning" on the *Ready to Die* album. Westbound also states that it is "patently unfair" for defendants to argue that they did not repeat the illegal sampling because defendants objected during trial to any references to other unauthorized samples. It was Westbound's obligation to introduce evidence of other unauthorized samples, and even though the district court excluded certain evidence of other ongoing lawsuits against defendants, Westbound fails to challenge those evidentiary rulings on appeal.

In this case where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow. This conclusion is apparent from our court's precedent. In *Clark v. Chrysler Corp.*, this court held that a punitive damages award of $3 million was unconstitutional in light of a damages verdict of approximately $471,258.26, only 50% of which the plaintiff was awarded (pursuant to comparative negligence principles), where only the fact that the conduct resulted in physical harm, notably, the loss of life, weighed in favor of reprehensibility. 436 F.3d at 601, 605, 608 (Opinion of Restani, J.); 436 F.3d at 612-14 (Kennedy, J., concurring in part and concurring in the judgment). The court instructed the district court to enter a punitive damage award of approximately $471,258.26, which Judge Restani concluded was appropriate after applying a 2:1 ratio to the plaintiff's 50% share of compensatory damages, *id.* at 608 (Opinion of Restani, J.), and Judge Kennedy concluded was appropriate after applying a 1:1 ratio to the total compensatory damage award. *Id.* at 613-14 (Kennedy, J., concurring in part and concurring in the judgment). Also, in *Bach v. First Union National Bank*, this court, after having previously decided that a punitive damages award of approximately $2.6 million on top of a $400,000 compensatory damages award was unconstitutionally excessive because the only reprehensibility factor that weighed in favor of a large punitive damages award was that plaintiff, an elderly widow, was a vulnerable victim, held that the district court's remitted punitive damages award of approximately $2.2 million was still excessive and ordered the district court to remit punitive damages to $400,000. 486 F.3d at 154-56.

Our conclusion is supported by a case from the Eighth Circuit that concluded that a 1:1 ratio was appropriate where the compensatory damages award was large and the defendant's conduct was

more reprehensible than in this case. In *Williams v. ConAgra Poultry Co.*, the court reversed a punitive damages award of approximately $6 million, which was on top of a $600,000 compensatory damages award for a racial harassment claim under § 1981. 378 F.3d 790, 792-93 (8th Cir. 2004). The court concluded that the district court improperly relied on evidence of non-similar acts of harassment, but that the defendant's disparate treatment of plaintiff was still reprehensible in light of evidence that defendant extended certain benefits to white managers and employees that it did not offer to black managers and employees. *Id.* at 797-98. The court also considered the fact that Title VII capped punitive damages at $300,000, and that the $600,000 in compensatory damages was "a lot of money," and held that defendant's conduct was not "so egregiously reprehensible" to justify a punitive damages award of more than $600,000. *Id.* at 798-99.

## 2.    *Disparity*

The disparity between compensatory and punitive damages in this case further supports the conclusion that the punitive damages award is unconstitutional, for three reasons. First, the ratio of the overall damages award to the punitive damages award—approximately 9.5:1 ($3.5 million / $366,939)—is large. Although the Supreme Court has repeatedly rejected the use of bright-line rules, it has cautioned that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425, and it has noted that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)); *see also Clark*, 436 F.3d at 606.

Second, the compensatory damage award itself is very large. The Supreme Court has made clear that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. In *Bach*, this court concluded that a $400,000 compensatory damages award was "substantial" and thus, applying "the hypothetical scenario described in *State Farm*, where the plaintiff has received a substantial compensatory damages award, and a ratio of 1:1 or something near to it is an appropriate result," instructed the district court "to enter an order of remittitur reducing the punitive damages award to no more than $400,000." 486 F.3d at 156-57. Also, in *Pollard v. E.I. DuPont de Nemours, Inc.*, this court affirmed a punitive damages award of $2.5 million that the district court added to a total compensatory damages award of $2.2 million, which included approximately $1.2 million in back and front pay, because the ratio (1:1 overall and 2:1 when back and front pay were excluded) was close to "the 1-to-1 ratio mentioned in [*State Farm*] for the largest [compensatory] awards." 412 F.3d 657, 666-68 (6th Cir. 2005). In the instant case, the amount of compensatory damages that Westbound was awarded, $366,939, is large and approximately the same amount as that awarded in *Bach*. *See Bach*, 486 F.3d at 156.

Third, the compensatory damages award in this case included a punitive element. The "actual" harm that Westbound suffered is reflected in the amount of licensing fees that Westbound lost because of the infringement. In *State Farm*, the Supreme Court noted that a large punitive damages award is not justified where a compensatory damages award includes a punitive element that is duplicated in the punitive damages award. 538 U.S. at 426. Under the federal Copyright Act, an infringer is liable for the copyright owner's actual damages and the profits of the infringer. *See* 17 U.S.C. § 504. This dual recovery of plaintiff's damages and defendant's profits serves two distinct purposes: damages compensate the copyright owner whereas profits "'are awarded to prevent the infringer from unfairly benefitting from a wrongful act.'" *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 103 (2d Cir. 1999) (quoting H.R. Rep. No. 94-1476, at 161 (1976), *reprinted in* 17 U.S.C.A. § 504 at 146 (West 1996)). The purpose of awarding a plaintiff the defendant's profits from copyright infringement, therefore, overlaps substantially with the goals of punitive damages awards. It is undisputed here that the jury, in awarding Westbound damages under New York common law, followed the same formula and awarded actual damages plus profits. Westbound's actual damages

from the infringement were lost licensing fees of $43,478 (without interest) and $51,946 (with interest). Accordingly, the ratio of the punitive damages award and the non-punitive element of the compensatory damages award is very high.

Even if we were to accept Westbound's argument that the correct ratio is 3.5:1—which it calculates by including Bridgeport's share of compensatory damages ($366,939), even though Bridgeport elected statutory damages, and interest ($276,763.93)—the ratio indicates that the award is excessive. If these additional amounts were included within the compensatory damages award, that award would be significantly larger and, as discussed above, a substantial compensatory damages award means that a lower ratio is needed to satisfy the requirements of due process. *See State Farm*, 538 U.S. at 425. In addition, the smaller ratio would not change the fact, also discussed above, that the compensatory damages award included a large punitive element.[13]

### 3.        *Civil Penalties Comparison*

Finally, the amount of statutory damages available under the federal Copyright Act contributes to the conclusion that the punitive damages award in this case was unconstitutional. The Copyright Act provides that a plaintiff may elect statutory damages in lieu of actual damages and profits, and may ordinarily receive no more than $30,000 in statutory damages. 17 U.S.C. § 504(c)(1). But if the plaintiff proves that the "infringement was committed willfully," the plaintiff may receive statutory damages of up to $150,000. *Id.* § 504(c)(2). Accordingly, the ratio of the punitive portion to the compensatory portion of statutory damages under the Act is 4:1 (($150,000 - $30,000):$30,000). Of course, $150,000 is the *maximum* allowable, and thus would be the largest award that a victim of copyright infringement could receive irrespective of the reprehensibility of an infringer's conduct. Here, defendants' conduct, although willful, was not highly reprehensible. In addition, as discussed above, the size of the allowable ratio fluctuates with the size of the compensatory damages award, and thus the 4:1 ratio in the Act suggests that a smaller ratio for a larger damages award is appropriate.

### 4.        *Summary*

Given the large compensatory damages award of $366,939, a substantial portion of which contained a punitive element, and the low level of reprehensibility of defendants' conduct, a ratio of closer to 1:1 or 2:1 is all that due process can tolerate in this case. Therefore, we remand to the district court for a remittitur of the punitive damages verdict (or a new trial). *See Bach*, 149 F. App'x at 367.

## IV.

Defendants raise two additional issues on appeal that do not concern the propriety of the trial or damages. First, one of the defendants, UMG, argues that plaintiffs released it from liability in 2003. Second, defendants argue that an injunction that the district court imposed after the trial was improper. We reject UMG's argument with respect to the release issue and also affirm the district court's injunction and impoundment order.

---

[13] Because we conclude that the ratio when calculated according to the overall punitive damages award indicates that the award was excessive, we need not also address defendants' argument that the appropriate ratios should be calculated by comparing the amount of punitive damages assessed against each defendant measured against the profits for each defendant, which yield ratios of 5:1 for Bad Boy Entertainment, 73:1 for Bad Boy LLC, and 58:1 for UMG.

### A.        *Release of UMG (Issue 4)*

Plaintiffs did not release UMG from liability in an April 2003 settlement agreement that plaintiffs entered into with EMI April Music, Inc.  In that agreement plaintiffs released, among others, licensees and sublicensees of EMI from certain claims, including those claims brought in the present lawsuit:

> **Bridgeport**, on behalf of itself and its successors and assigns, **hereby releases and forever discharges EMI, its** songwriters, recording artists, producers, affiliated co-publishers, administered publishers, subpublishers, distributors, subdistributors, **licensees or sublicensees of EMI**, and their officers, directors, shareholders, partners, agents, contractors, attorneys, predecessors in interest, affiliates, subsidiaries, parent and sister companies, successors and assigns (the "Released Parties") **from any and all claims, lawsuits**, counterclaims, demands, charges, obligations, debts, losses, costs, liabilities, expenses, actions, and causes of actions past, present or future, known or unknown, of whatsoever nature, **which Bridgeport may have**, including but not limited to all claims arising out of the EMI Works, the Bridgeport Compositions and Sound Recordings, the Alleged Infringements, the Additional Claims, and the Lawsuits.  All of the claims released by Bridgeport shall be hereinafter referred to as the "Released Claims."  **For purposes of clarification, it is the intention of Bridgeport to release any and all parties that derive their rights from EMI ("Licensees") to the same extent as EMI is released herein. Licensees are being released only with respect to Released Claims where they are a licensee of EMI and not for claims where Licensees do not derive their rights from EMI.**

J.A. 493-94 (Settlement Agreement and Release § 4.A.) (emphasis added).  However, the release specifically excluded Bad Boy:  "The foregoing release, and the other provisions contained herein, specifically does not apply to Justin Combs Publishing, Bad Boy Records, or Bad Boy Entertainment."  J.A. 495 (Settlement Agreement and Release § 4.D.).  UMG argues that because it is a sublicensee of EMI and derived its rights from EMI, it is explicitly covered by the release agreement and, therefore, plaintiffs released their claims against UMG.  Plaintiffs argue that (1) there is no evidence of a license between EMI and Bad Boy and that UMG was not properly a licensee of Bad Boy, and thus could not be a sublicensee of EMI, (2) UMG derived its rights from Bad Boy, not from EMI, and thus was not included within the release language, and (3) the release explicitly excluded Bad Boy, and because UMG derived its rights from Bad Boy, it too should be excluded.[14]

As a preliminary matter, plaintiffs' argument that UMG waived this issue by failing to raise it "in any post-trial motions" is simply incorrect as a factual matter.  UMG raised the issue three times:  first, in a Second Motion for Summary Judgment, again, in a Rule 50 motion for judgment as a matter of law, and a final time, in a renewed Rule 50 motion after the close of all the evidence.[15]  Therefore, UMG may raise the issue on appeal.

---

[14]The parties agree that Tennessee law governs interpretation of the Settlement Agreement and Release.

[15]In a report and recommendation, adopted and approved by the district court, the magistrate judge denied UMG's motion for summary judgment because "a reasonable jury could easily find that there was no intent by the parties to the settlement agreement to release those entities deriving their rights directly from the Bad Boy entities."  The district court also denied UMG's Rule 50 motion because it involved "a question of intent" that was "a classic jury question." The district court denied UMG's renewed Rule 50 motion at the close of evidence for the same reason.

With respect to the merits, plaintiffs are correct that there is no evidence in the record of a license between EMI and Bad Boy. Defendants claim in their brief that EMI licensed "Ready to Die" to Arista on behalf of Arista and Bad Boy (presumably as joint venturers). So far as we can tell, there is no licensing agreement in the record. When asked at oral argument for evidence to substantiate this claim, counsel for defendants directed this court to a portion of defendants' cross-examination of Robert Sullivan, an attorney for EMI. *See* J.A. 2107-17. In that examination, Sullivan testifies only that, hypothetically, if Bad Boy were a licensee of EMI and if UMG were a licensee of Bad Boy, then UMG would be a sublicensee of EMI and would be released from liability. J.A. 2112. Because there is no evidence of a license between EMI and Bad Boy, there is no need for the court to address plaintiffs' other arguments.

### B.        Injunction (Issue 10)

The district court did not err by issuing an injunction and impoundment order. After the jury verdict in favor of plaintiffs, the district court, in response to plaintiffs' motion, issued an injunction "[p]ursuant to 17 U.S.C. § 503, Fed. R. Civ. P. 65, 28 U.S.C. § 1651 and the inherent equitable powers of the Court." The court enjoined defendants from using the song "Ready to Die" or the album *Ready to Die*. The court also ordered defendants to impound all copies of the song and album. The court reasoned that plaintiffs are entitled to the exclusive use of "Singing in the Morning" and that plaintiffs would suffer irreparable harm without an injunction and impoundment order. The court also concluded that money damages would be insufficient to protect plaintiffs' rights in "Singing in the Morning." Finally, the court found that an injunction and impoundment order was in the public interest to vindicate plaintiffs' rights, and that the "balance of relative harms among the parties weighs in favor of injunctive relief and impoundment."[16]

Defendants ask this court to reverse the district court's injunction and impoundment order because (1) the balancing of the relative harms to the parties does not justify the order, and (2) the doctrines of laches and estoppel preclude injunctive relief.

The federal Copyright Act authorizes injunctive relief and impoundment as remedies for infringement. 17 U.S.C. §§ 502, 503. When a district court grants a permanent injunction, this court reviews its factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for an abuse of discretion. *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1118 (6th Cir. 2001). "It is uncontroversial that a 'showing of past infringement and a substantial likelihood of future infringement' justifies issuance of a permanent injunction." Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[B] (2007) (hereinafter Nimmer). Not only is the issuance of a permanent injunction justified "[w]hen a copyright plaintiff has established a threat of continuing infringement, he is *entitled* to an injunction." *Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990) (emphasis in original); *see also* Nimmer § 14.06[B] ("Generally, it would appear to be an abuse of discretion to deny a permanent injunction where liability has been established and there is a threat of continuing infringement."). This is because "in copyright infringement actions, the denial of a request for injunctive relief could otherwise 'amount to a forced license to use the creative work of another.'" *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967-68 (8th Cir. 2005) (quoting *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004)); *cf. W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281 (Fed. Cir. 1988)

---

[16]Defendants filed a motion asking the district court to dissolve the injunction and impoundment order because the balance of hardships weighed in favor of defendants and the doctrines of laches and estoppel precluded injunctive relief, and asking the district court in the alternative to modify its order to limit the order to apply only to the infringing material. The district court stood by its previous order, but modified the injunction to clarify that the injunction and impoundment order was limited to use of the infringing material in the song and album, and thus did not prevent defendants from using the song or album to the extent that they could remove the infringing material.

(noting that in patent cases, "an injunction should issue once infringement has been established unless there is a sufficient reason for denying it").

Defendants do not challenge any of the district court's factual findings or legal conclusions, and defendants fail to demonstrate that the district court abused its discretion. Defendants argue that monetary relief for future infringement is sufficient because plaintiffs are in the business of licensing their copyrighted material and even offered to license to defendants the copyrighted material at issue in this case. Defendants also argue that they will suffer by not receiving profits for the infringing work and the public will be denied the opportunity to listen to *Ready to Die*. These are not concerns unique to this case and do not make the district court's adoption of the injunctive remedy, which is the standard remedy when past infringement has been proven and future infringement is likely, an abuse of discretion. In addition, plaintiffs have every incentive to negotiate a licensing agreement with defendants to permit them to distribute the infringing work, and there is no reason to believe that the parties will not bargain around the injunction.

The district court did not abuse its discretion by rejecting defendants' argument that the doctrine of laches precludes injunctive relief. "Ordinarily, an appellate panel reviews 'a district court's resolution of a laches question for an abuse of discretion.'" *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* (quotations omitted). Defendants quote Learned Hand for the proposition that "it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success." *Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916); *accord Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). This court does not go so far, and cautions that although the doctrine of laches may be applied in copyright cases, it should be applied "rarely" and only in "unusual circumstances." *Chirco*, 474 F.3d at 233-36 (affirming district court's application of laches to plaintiffs' two-and-one-half-year delay in filing suit, where plaintiffs knew of defendants' infringement of construction plans before construction began, "ma[de] any effort to procure the destruction of buildings already occupied, sold, or substantially constructed unduly prejudicial to the defendants").

This is not the rare and unusual case in which a district court abused its discretion by not holding that laches applies. Defendants note that plaintiffs knew about the infringement in 1998, but did not pursue their claims. The parties agreed that the complaint would be deemed as having been filed on May 4, 2001. Pursuant to the three-year statute of limitations, defendants were only liable for acts of infringement that occurred on or after May 4, 1998. In effect, defendants are asking this court to hold that the doctrines of laches and estoppel shortened the limitations period. But unlike *Chirco* and *Haas*, this is not a case where plaintiffs sat back and watched while defendants invested large sums into a project, only to sue when it appeared that the project would be successful. As defendants acknowledge, "The album *Ready to Die* was first sold in 1994 and became an instant classic, well known throughout the world." Defendants' Br. at 65. Defendants' investment in the album had already been made and defendants had already realized the success of the album by the time plaintiffs discovered the infringement in 1998. Thus, this is not a case where defendants acted improperly by waiting to file suit, and the district court, therefore, did not abuse its discretion.

Similarly, the district court did not err by rejecting defendants' estoppel defense. The manner in which defendants are using the term "estoppel" is unclear. Defendants appear to equate estoppel with laches because they lump laches and estoppel together and repeatedly refer to the "inactivity" of plaintiffs. If that is the case, then their argument is answered by the discussion above with respect to laches. Alternatively, if defendants mean traditional equitable estoppel, then their argument also fails. Estoppel requires, among other things, that "the party to be estopped must have

used conduct or language amounting to a representation of material fact" and "the party asserting estoppel must have detrimentally and justifiably relied on the representation." *Thomas v. Miller*, 489 F.3d 293, 302 (6th Cir. 2007) (quotations omitted). Defendants appear to base their claim on the fact that, while the lawsuit was pending, they re-released *Ready to Die* in 2004 and plaintiffs failed to object. Defendants argue that they reasonably believed that they would be able to compensate plaintiffs for the continuing infringement if plaintiffs won the lawsuit. However, defendants do not refer to any actions plaintiffs took or assurances that plaintiffs made that would have justified a belief that plaintiffs would not object to the re-release. Furthermore, it was unreasonable for defendants to rely on plaintiffs' failure to object immediately to the re-release when the parties were already in the midst of litigation concerning the original album.

## V.

For the foregoing reasons, we AFFIRM in part and REVERSE in part. We affirm the district court's order denying defendants' Motion for Mistrial or to Modify Verdict with respect to defendants' arguments that (1) the verdict was the result of the passion and prejudice of the jury and not supported by the evidence; (2) the district court erred by excluding evidence of willfulness; (3) the district court erred by bifurcating the trial; and (4) the jury award did not apportion defendants' profits from infringing between the infringing and non-infringing material. We also affirm the district court's injunction and impoundment order and the district court's order denying defendants' summary judgment on the issue of whether plaintiffs released UMG from liability. We reverse the district court's order denying defendants' Motion for Mistrial or to Modify Verdict with respect to defendants' arguments that (1) the verdict improperly included compound and prejudgment interest; (2) the punitive damages award was unconstitutional; and (3) the jury chose an improper date from which to award interest. On remand, the district court should (1) offer plaintiffs a remittitur on compensatory damages to account for the inclusion of compounded, prejudgment interest; (2) offer plaintiffs a remittitur on punitive damages; and (3) recalculate the date from which interest may be awarded.